<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

MARLO MAZUR,

               Plaintiff,

v.

NANCY A. BERRYHILL,
Acting Commissioner
of Social Security,

             Defendant.

Case No.:  2:17-cv-11503 (PAZ)

**OPINION**

**APPEARANCES:**

STEPHEN GAECHTER, ESQ.
58 MAIN STREET
HACKENSACK, NJ  07601
     On behalf of Plaintiff

DAVID E. SOMERS, III
SPECIAL ASSISTANT U.S. ATTORNEY
C/O SOCIAL SECURITY ADMINISTRATION
OFFICE OF GENERAL COUNSEL
P.O. BOX 41777
PHILADELPHIA, PA  19101
     On behalf of Defendant

**PAUL A. ZOSS, United States Magistrate Judge.**

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Marlo Mazur for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. §§ 401, et seq.).

Plaintiff appeals from the final decision of the Administrative Law Judge ("ALJ") denying the

application; Defendant, the Commissioner of Social Security ("the Commissioner"), opposes

Plaintiff's appeal.[1]  After careful consideration of the record, including the ALJ hearing transcripts, the ALJ's decision, and the pleadings and memoranda of the parties, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f).  For the reasons set forth below, the Court affirms the Commissioner's decision that Plaintiff was not disabled.

## I.    PROCEDURAL HISTORY

On September 8, 2014, Plaintiff filed an application for DIB alleging a disability onset date of August 24, 2014.  (R. 168-69.)[2]  On February 7, 2014, the Commissioner determined that Plaintiff was not disabled and denied the application.  (R. 97.)  Plaintiff filed for reconsideration, and on July 9, 2015, the application was again denied.  (R. 107.)  On April 5, 2017, an Administrative Law Judge held a hearing on Plaintiff's application at which Plaintiff was represented by counsel.  (R. 37-85.)  On June 19, 2017, the ALJ issued a decision denying Plaintiff's application.  (R. 18-36.)  On September 15, 2017, the Appeals Council denied Plaintiff's request for review (R. 1-7), thereby affirming the ALJ's decision as the "final" decision of the Commissioner.

On November 10, 2017, Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3).  ECF No. 1.  On June 29, 2018, Plaintiff consented to have a U.S. Magistrate Judge conduct all further proceedings in the case to disposition pursuant to 28

---

[1] In March 2018, the U.S. Government Accountability Office informed the President of its determination that Nancy Berryhill had exceeded the time limit under the Federal Vacancies Reform Act of 1998 allowing her to serve as the Acting Commissioner of the Social Security Administration without the nomination of a successor.  Accordingly, Ms. Berryhill stepped down as Acting Commissioner and continued to lead the agency from her title of record as Deputy Commissioner for Operations.  In April 2018, Ms. Berry resumed her role as Acting Commissioner.  *Patterson v. Berryhill*, No. 18-cv-193 (DWA), 2018 U.S. Dist. LEXIS 99486 (W.D. Pa. Jun. 14, 2018); *see* 5 U.S.C. § 3346(a)(2).

[2] "R." refers to the continuous pagination of the administrative record.  ECF No. 6.

U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. ECF No. 14.[3] The case was reassigned to the undersigned Magistrate Judge on December 25, 2018. ECF No. 15.

## II.    LEGAL STANDARD

### A.    <u>Standard of Review</u>

This Court has the authority to conduct a plenary review of legal issues decided by the ALJ in reviewing applications for Social Security disability benefits. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g) & 1383(c)(3). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *see K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309 (JLL), 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018). Thus, substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'" *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *see K.K.*, 2018 WL 1509091, at *4.

The substantial evidence standard is a deferential one, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g., Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry

---

[3] Defendant has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484 (RBK), 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d

501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000));

*see K.K.*, 2018 WL 1509091, at *4.  The Court "need[s] from the ALJ not only an expression of

the evidence s/he considered which supports the result, but also some indication of the evidence

which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ

may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which

[s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186

F.3d 422, 429 (3d. Cir. 1999)).  "[T]he ALJ is not required to supply a comprehensive explanation

for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice."

*Cotter*, 650 F.2d at 482.  Absent such articulation, the Court "cannot tell if significant probative

evidence was not credited or simply ignored." *Id.* at 705.  As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the
> weight [s/]he has given to obviously probative exhibits, to say that [the] decision is
> supported by substantial evidence approaches an abdication of the court's duty to
> scrutinize the record as a whole to determine whether the conclusions reached are
> rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can

enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or

without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  Remand is appropriate if the

record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or

contradictory findings.  *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210,

221-22 (3d Cir. 1984).  Remand is also appropriate if the ALJ's findings are not the product of a

complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the

record.  *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see*

*A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).  A decision to "award

benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518.  In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays.  *See*, *e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000).  An award is "especially appropriate when "further administrative proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits."  *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

> ### B.    <u>Standard for Awarding Benefits</u>

Under the Social Security Act, an adult claimant (i.e., a person over the age of eighteen) is disabled and eligible for Social Security disability benefits based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  20 C.F.R. §§ 404.1505(a), 416.905(a).[4]  An impairment is "medically determinable" if it results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques.  Thus, an impairment can be established by objective medical evidence from an acceptable medical source, but cannot be established by a statement of symptoms, a diagnosis, or a medical opinion.  *Id*. §§ 404.1521, 416.921.

---

[4] Although the standards for disability are the same under Title II (42 U.S.C. §§ 401, et seq.) and Title XVI (42 U.S.C. §§ 1381, et seq.) of the Social Security Act, these are separate government programs subject different qualification requirements.

The process for determining an adult's claim for Social Security disability benefits involves a five-step sequential inquiry. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a).[5] The claimant bears the burden of proof at Steps One through Four. At Step Five, the burden shifts to the Commissioner. *Id*. §§ 404.1512, 416.912; *see Holley v. Colvin*, 975 F. Supp.2d 467, 476-77 (D.N.J. 2013), *aff'd sub nom. Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014). At each Step, the ALJ must consider the combined effect of all the claimant's physical and mental impairments without regard to whether any single impairment, if considered separately, would be of sufficient severity to proceed to the next Step. 20 C.F.R. §§ 404.1523(c), 416.923(c).

At Step One, the ALJ decides whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). Substantial gainful activity is work activity that involves doing significant physical or mental activities and is usually done for pay or profit. *Id*. §§ 404.1572(a) & (b), 416.972(a) & (b). If the claimant is engaging in such activity, then the inquiry ends because the claimant is not disabled.

"The [Step Two] inquiry is a de minimis screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). At this Step, the ALJ decides whether the claimant has a medically determinable impairment or a combination of such impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is severe if it significantly limits a claimant's ability to perform basic work activities. An impairment or combination of impairments is not severe if the claimant has a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional

---

[5] This case arises from a claim filed before March 27, 2017 and is therefore analyzed by this Court – as it was by the ALJ – under 20 C.F.R. §§ 404.1527 and 416.927.

limitations. *Id.* §§ 404.1522, 416.922. If the claimant does not have a severe impairment or combination of impairments, then the inquiry ends because the claimant is not disabled.

At Step Three, the ALJ decides whether the claimant's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. If the claimant's specific impairment is not listed, the ALJ will consider the most closely analogous listed impairment for purposes of deciding medical equivalence. *Id.* §§ 404.1526(b)(2), 416.926(b)(2). If the claimant has an impairment or combination of impairments that meets or medically equals a Listing, then the claimant is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id.* §§ 404.1509, 416.909.

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC"), determine the physical and mental demands of the claimant's past relevant work, and determine whether claimant has the level of capability needed to perform past relevant work. 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). RFC is the claimant's maximum remaining ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. Past relevant work is work performed (either as the claimant actually performed it or as it is generally performed in the national economy) either within the last 15 years or within 15 years prior to the disability date. In addition, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity. *Id.* §§ 404.1560, 404.1565, 416.945, 416.960. If the claimant's RFC enables her/him to perform past relevant work, then the claimant is not disabled.

At Step Five, the ALJ must decide whether the claimant, considering her/his RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(g), 416.920(g).  If the claimant is incapable of doing so, then s/he is presumed to be disabled if her/his impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

In deciding the claimant's ability to perform other jobs that exist in significant numbers in the national economy, the ALJ must consider whether the claimant's impairment and symptoms result in exertional and/or non-exertional limitations.  The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling.  *Id*. §§ 404.1569a(a) & (b), 416.969a(b).  Non-exertional limitations affect a claimant's ability to meet all other demands of a job (i.e., non-strength demands), including but not limited to difficulty performing manipulative or postural functions such as reaching, handling, stooping, climbing, crawling, or crouching; difficulty tolerating physical features of certain work settings such as dust or fumes; or difficulty maintaining concentration or understanding detailed instructions.  *Id*. at §§ 404.1569a(c), 416.969a(c).

If the claimant has no non-exertional limitations and can perform all or substantially all exertion demands at a given level, then the ALJ must use the Medical-Vocational Rules (also referred to as "Grid Rules") found at 20 C.F.R. § 404, Subpart P, Appendix 2.  20 C.F.R. §§ 404.1569a(b), 416.969a(b).  The Grid Rules reflect various combinations of RFC, age, education, and work experience, and direct a finding of disabled or not disabled for each combination.  If the claimant also has any non-exertional limitations or cannot perform

substantially all the exertional demands at a given level, then the Grid Rules are used as a framework for decision-making unless there is a rule that directs a conclusion of disabled without considering the additional non-exertional or exertional limitations. *Id*. §§ 404.1569a(d), 416.969a(d). If the claimant has solely non-exertional limitations, then the Grid Rules provide a framework for decision-making. *Id*. §§ 404.1569a(c), 416.969a(c).

## III. ALJ DECISION AND APPELLATE ISSUES

Plaintiff was forty-six years old on the alleged onset date (August 25, 2014) and last met the insured status requirements of the Social Security Act on March 31, 2016. (R. 23, 30.) At Step One, the ALJ found that Plaintiff did not engage in substantial gainful activity during the period between the alleged onset date and the date last insured. (R. 23.) At Step Two, the ALJ found that Plaintiff had the following severe impairment: disorders of the spine. The ALJ also found at Step Two that Plaintiff had the following impairment that was not severe: depression. (R. 23.) At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of any Listing. (R. 25.) At Step Four, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work subject to various postural limitations. (R. 25.) The ALJ also found at Step Four that Plaintiff was unable to perform her past relevant work as a restaurant waitress/server. (R. 30.) At Step Five, the ALJ found that a finding of not disabled would be directed by Grid Rule 201.19 if Plaintiff had the RFC to perform the full range of sedentary work. The ALJ also found at Step Five that at least 3 jobs – order clerk (DOT #209.567-014), assembler (DOT #739.687-066), and table worker (DOT #739.687-182) – existed in significant numbers in the national economy and could be performed by an individual with Plaintiff's age, education, work experience, and RFC. (R. 31.) The ALJ

concluded that Plaintiff was not disabled at any time between her alleged onset date and the date last insured.  (R. 32.)

Plaintiff's attack is threefold.  First, she contends that the ALJ erred at Step Three in concluding that "Plaintiff's condition did not meet or equal listing 1.04 for disorders of the spine." (R. 11.)  Second, Plaintiff contends that the ALJ erred at Step Four because the RFC finding "is not based on substantial evidence and is actually premised partly on a mischaracterization of the evidentiary record."  (R. 12.)  Third, Plaintiff contends that the ALJ erred in assessing Plaintiff's subjective symptoms.  (R. 15.)  Plaintiff asks the Court to remand for payment or, alternatively, for a new hearing.  Defendant contends that the ALJ's decision should be affirmed in its entirety because it correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence.

## IV.   SUMMARY OF RELEVANT EVIDENCE

The relevant period before the ALJ was August 25, 2014 (alleged onset date) through March 31, 2016 (date last insured).  The record contains – and the ALJ's decision cited – medical evidence that both precedes and post-dates the relevant period.  The following summary thus includes all medical evidence before the ALJ.[6]

### A.   Medical Evidence.

#### 1.   Before Alleged Onset Date.

In February 2013, Plaintiff went to the emergency room at Hackensack University Medical Center Main Hospital after she slipped and fell at work as a restaurant server.  Her complaints included numbness and bilateral mid/lower back pain that radiated into her legs and right lower extremity.  A lumbar spine MRI revealed:  status-post L4 and L5 laminectomy; degenerative

---

[6] Plaintiff also submitted additional medical evidence directly to the Appeals Council.

desiccative disc disease at L3-4 through L5-S1 and at T12-L1; broad-based disc bulge at L4-5, with an additional left lateral disc protrusion resulting in left-sided neural foraminal narrowing and contiguity with the L4 nerve root in the neural foramen; right paracentral disc protrusion at L3-4 contributing to right greater than left lateral recess stenosis, with mild right neural foraminal stenosis; and right paracentral disc extrusion at T12-L1.  The on-call neurologist opined that Plaintiff "most likely would not benefit from a surgical intervention" because the imaging "d[id] not correlate" with her complaints.  Plaintiff was prescribed Decadron and advised to follow up with a neurologist in three weeks.  (R. 270-82.)  Ten days later, Plaintiff was evaluated by Dr. Thomas Peterson (neurologist), who reported:

> [Plaintiff] comes in for routine followup visit after her 2/12/2013 Hackensack admission for nonradicular low back pain.  She is approximately 10 years status post lumbar surgery by Dr. Klempner.  She was never really 100% thereafter.  On 2/10/2013, her pain got much worse and she presented to Hackensack Medical Center.
>
> Since her hospitalization she is a little bit better.  She is now complaining of low back pain radiating to both legs (right worse then left) in the buttocks, posterior thighs, posterior calves and she now has right lateral thigh numbness.
>
> Lower extremity motor testing reveals diffuse right leg 3/5 and left leg 3.5/5 strength in the quadriceps, anterior tibialis, extensor hallucis longus, gastrocnemius and hamstring muscles.  There is clearly very poor resistance to confrontation motor testing and there is significant functional overlay.
>
> PLAN:  I have given her a prescription for physical therapy and I will see her on 3/19/2013.  If she does not respond to this, I will recommend lumbar epidural steroid injections.

(R. 283-84.)

In May 2013, Plaintiff was evaluated by Dr. Richard S. Nachwalter (spine surgeon with Atlantic Spine Specialists) regarding her worker's compensation claim for the slip and fall.  He reported:

> [Plaintiff] is a patient who has been previously seen by me in 2008. She has a long lumbar history dating back to 2001 at which time she underwent a lumbar laminectomy at an outside facility. She always had residual complaints after her laminectomy including back pain and right lower extremity pain as well as right lower extremity weakness. She indicates that she was managing reasonably well up until February 10, 2013 when she slipped and twisted at work. She describes increasing pain in her back with some aggravation of her right lateral thigh numbness. She was evaluated in the emergency department in Hackensack and subsequently discharged. She describes back pain and predominantly right lower extremity pain with some episodic left leg pain. Her overwhelming complaint is her lower back. She has been treated with Aleve and Vicodin.

Dr. Nachwalter diagnosed lumbar strain and aggravation of pre-existing lumbar pathology, opining that Plaintiff's prognosis was good and that "he expected she will be back to her baseline with some conservative treatment." He prescribed physical therapy, recommended over-the-counter anti-inflammatory medications, and provided a return-to-work note. (R. 285-87.)

Also in May 2013, Plaintiff's primary doctor referred her to Dr. Rajnik Raab (a neurosurgeon with North Jersey Spine Group). Dr. Raab reported that after her 2001 surgery Plaintiff's "pain syndrome followed a waxing/waning course, but she was able to maintain normal activities at work and leisure" until February 2013. Dr. Raab's review of the February 2013 lumbar spine MRI revealed left lateral disk protrusion extending into the left neural foramen, with compression of the exiting left L4 nerve root. Physical examination findings included: tenderness on palpation of lower lumbar spine; reduced flexion, extension, and bilateral bending of the lumbar spine due to lower back pain and right leg pain; decreased sensation on right L5 and S1; stooped and antalgic gait; manual motor testing results ranging from 3-5; inability to toe-walk or heel-walk on the right; and positive straight leg raise on right. Dr. Raab opined:

> [Plaintiff] is experiencing a great deal of predominately axial lumbar pain, along with right-sided L5/S1 radiculopathy, which now interferes with all activities. She is unable to work or engage in leisure pursuits. Her imaging reveals disk disruption and desiccation at L3-4, L4-5, and L5-S1, with abnormal sagittal and coronal alignment at these levels. The patient will be evaluated by pain management for facet and epidural steroid injections. Depending on response, she will then require

aggressive physical therapy for core strengthening.  If conservative measures do not provide adequate relief, she may require 3-level anterior lumbar interbody fusion.

(R. 301-03.)

In June 2013, Plaintiff was evaluated by Alana N. Grundel (physical therapist with Kessler Rehabilitation Center).  Plaintiff stated that she had just started a new job working full-time at a restaurant and held plates individually "to lessen the load" instead of carrying heavy serving trays.  Ms. Grundel recommended a physical therapy regime consisting of three sessions per week for one month, opining that Plaintiff's overall prognosis was good.  (R. 288-94.)

## 2.    After Alleged Onset Date & Before Date Last Insured.

In July 2014, Ms. Mary Albright (advanced practice nurse with North Jersey Spine Group and colleague of Dr. Raab) reported that, in addition to long standing radicular pain down the left leg, Plaintiff complained of worsening axial back pain with radicular pain down the right buttock and right leg.  Plaintiff also complained of paresthesia in her feet, with numbness and tingling after sitting for 20 minutes or more.  Plaintiff stated that she was taking Vicodin and Flexeril, and that increasing pain made it increasingly difficult to work her shifts as a restaurant server.  Ms. Albright observed paraspinal spasm greater on left than right.  She opined:

> [Plaintiff] is experiencing a great deal of predominately axial lumbar pain, along with both right and left-sided L5/S1 radiculopathy, which now interferes with all activities.  She is finding it increasingly more difficult to work and engage in normal daily activities.  MRI of the lumbar spine needs to be obtained, after which the patient should return to discuss surgical options, which she has expressed an interest in pursuing.

(R. 304-05.)  On July 24, a lumbar spine MRI revealed two level disc herniation but no central spinal stenosis at any level.  (R. 306-08.)

In August 2014, Plaintiff was evaluated by Dr. Raab, who reported the same physical examination findings as in May 2013.  He opined:

The patient's axial pain syndrome is predominately from her coronal and sagittal imbalance, with associated severe degenerative pathology at L3-4, L4-5 (which levels have undergone prior laminectomy), and L5-S1. Her radicular symptoms stem from the right disk herniation at L3-4, the left disk herniation at L4-5, and foraminal stenosis at L5-S1.

Surgical intervention would have to address both axial and radicular components of pain. This would require radical diskectomy and instrumented interbody fusion at L3-4, L4-5, and L5-S1, along with direct neural decompression at these levels.

I do not think that the patient requires an extensive deformity correction surgery from T10-S1.

(R. 312-14.)

In October 2014, Plaintiff's primary care physician, Dr. Stephen Kriso (internist), opined:

This 46 year old woman has had chronic low back pain for several years. She has undergone decompressive laminectomies at L4 and L5 in 2001. She did not receive good relief. Her problems continued.

She continued to work as a waitress, in spite of the continued back pain. She is currently seeing Rajnik Raab, M.D., a neurosurgeon. At the present time, she is to undergo further back surgery for adhesion removal, and further laminectomy repair.

She was most recently seen in this office on October 6th, 2014. She had continual back pain with right sciatic radiation.

She has decided that the pain is too severe to not have surgery. She otherwise can do no work which required her to stand and or walk; waitressing is completely out of the question.

At the present time, at this visit, she is considered to be totally disabled and unable to do gainful work. A re-evaluation in 6-8 months after this currently intended surgery will tell [if] she can return to the workforce.

Until that time, she is considered 100% disabled.

(R. 295.)[7]

Also in October 2014, Dr. Raab performed the following surgical procedures: radical discectomy at L3-4, L4-5, and L5-S1 with foraminotomies; interbody fusion at L3-4, L4-5, and

---

[7] Dr. Kriso's letter is erroneously dated November 7 instead of October 7.

L5-S1 with PEEK cage and allograft; anterior instrumentation at L3-4, L4-5, and L5-S1; and fluoroscopy with interpretation.  (R. 323-26.)  During a follow-up on October 15, Dr. Raab reported that Plaintiff exhibited no back pain on palpation or percussion, intact motor strength, and no tenderness in the lower extremities.  (R. 327-28.)

In November 2014, Plaintiff advised Dr. Raab that her back pain was significantly better, but that she was experiencing relatively severe bilateral leg pain and spasms involving the gluteus and hamstring musculature.  Physical examination findings included guarded movements, intact motor strength, and no tenderness in the lower extremities.  Dr. Raab diagnosed ongoing leg pain suggestive of neural irritability post decompression.  He prescribed analgesics and Neurontin, and he referred Plaintiff for physical therapy.  (R. 331.)

In January 2015, Plaintiff was evaluated by Dr. Monte A. Haber (physiatrist with North Jersey Spine Group and colleague of Dr. Raab).  Plaintiff advised that her back pain was completely resolved after the 2014 surgery and that residual leg pain was successfully treated with Neurontin.  She had developed constant sharp pain in her right buttock after attempting to restrain a dog over the Christmas holidays.  Other than a right drop foot that preceded her 2001 surgery and some bilateral thigh numbness, Plaintiff reported no weakness in her legs or feet and no radiating pain from her back into her legs or feet.  Physical examination findings included:  no bilateral lumbar paraspinal muscular tenderness; right (but not left) sacroiliac joint tenderness; full range of motion and normal strength in lower extremities; normal sensation in lower extremities except along bilateral lateral distal thighs; and positive right (but negative left) straight leg test both seated and supine.  Lumbar spine x-rays taken in the office revealed left sacroiliac joint degenerative changes.  After conferring with Dr. Raab, Dr. Haber opined that Plaintiff's pain was secondary to right sacroiliitis.  (R. 337-40.)

In February 2015, Dr. Haber performed a right sacroiliac joint steroid injection under fluoroscopic visualization. (R. 341-42.) Also in February, State Agency reviewing consultants opined that Plaintiff had the residual functional capacity to perform narrow light work. She could stand and/or walk (with normal breaks) for a total of 4 hours in an 8-hour workday; sit (with normal breaks) for a total of 6 hours in an 8-hour workday; frequently lift/carry up to 10 pounds; occasionally lift/carry up to 20 pounds; frequently kneel, crouch, and balance; occasionally stoop and crawl; and never climb ladders, ropes, or scaffolds. (R. 89-96.)

In June 2015, Dr. Raab reported that Plaintiff was progressing extremely well with resolution of her back pain and was also responding well to Neurontin for her lower extremity paresthesia. He also reported that, although Plaintiff initially responded well to the injection she received in February, her right sacroiliitis had returned and was restricting her activities. Physical examination findings included exquisite tenderness over the posterior superior iliac spine and intact muscle strength. Dr. Raab diagnosed acute right sacroiliitis and recommended an additional right sacroiliac joint injection followed by core strengthening therapy to prevent recurrence. (R. 370-71.)

In July 2015, State Agency reviewing consultants concurred on reconsideration with their colleagues' initial February 2015 opinion. (R. 98-106.)

On September 4, 2015, Dr. Raab reported that Plaintiff was unable to proceed "for logistical reasons" with the additional sacroiliac joint injection recommended in June. He also reported that Plaintiff had since developed neck and right arm pain associated with heaviness and numbness. Physical examination findings included: exquisite tenderness over the posterior superior iliac spine; intact muscle strength and brisk reflexes in the lower extremities; atrophy of the right triceps lateral head; and weakness of right elbow extension. Dr. Raab diagnosed acute

right sacroiliitis and right C7 radiculopathy with triceps weakness and atrophy.  He recommended

the same treatment for her sacroiliitis as in June and referred Plaintiff for a cervical spine MRI.

(R. 368-69.)  On September 9, a cervical spine MRI revealed:  C5-6 right central and paracentral

disc herniation with flattening of the ventral surface of the cord and mass effect on the existing

right C6 nerve root; and less severe degenerative changes present from C2-3 through C4-5 and at

C6-7.  (R. 366-67.)  On September 16, Dr. Raab's review of the MRI included that the C5-C6

right-sided herniation completely obstructed the foramen and the exiting C6 nerve root.  He

opined:

> Of the above, the patient['s] cervical symptoms predominate, and cause the greatest
> degree of disability.  She has atrophy and weakness on exam, with concordant
> findings on MRI.  Her symptoms have become progressively worse over 6 weeks.
>
> Given the chronicity and severity of this patient's pain syndrome, along with
> neurological deficit, surgical intervention can be offered.  The patient will be an
> excellent candidate for C5-6 ACDF.  The alternative of posterior decompression
> was discussed.
>
> The patient was also offered epidural steroid injections as a temporizing measure.

(R. 364-65.)

In December 2015, Plaintiff advised Dr. Raab that her pain was getting progressively

worse, interfered with all activities including sleep, and often caused her to drop things.  Physical

examination findings were the same as in September.  Dr. Raab diagnosed sacroiliitis and cervical

disk herniation with radiculopathy.  He opined:

> [Plaintiff] is experiencing severe right-sided upper extremity pain in the C6
> distribution secondary to advanced disk pathology at C5-6, including a right-sided
> disk herniation obstructing the foramen.  Clinically, she displays atrophy and
> weakness of the right upper extremity.  She has tried one epidural steroid injection
> as a temporizing measure, which provided partial benefit for two weeks.
>
> The patient is currently unable to function normally or to obtain adequate sleep
> because of her pain.  Given the intensity of her pain, along with a neurological
> weakness/atrophy, and concordant radiographic findings at C5-6, surgical

intervention can be offered as a quality-of-life measure. The patient would be an excellent candidate for C5-6 ACDF.

(R. 357-58.) Also in December 2015, Plaintiff advised her new primary care physician, Dr. Jesse G. Mangone (general practitioner with Whitney Medical), that she had cervical surgery planned the following month. (R. 395.)

In January 2016, Dr. Raab performed the following surgical procedures: anterior, radical discectomy/foraminotomies at C5-C6; interbody fusion at C5-C6 with PEEK cage and allograft; anterior plate at C5-C6; and fluoroscopy with interpretation. (R. 348-50.)

In February 2016, Plaintiff advised Dr. Raab that her right arm pain was completely resolved, but that she was experiencing a great deal of surgical discomfort across the posterior neck and trapezius regions on the right side. She occasionally took Vicodin and found that Valium helped with her spasmodic pain. Physical examination findings included: guarded movements secondary to pain; motor strength pain limited proximally but intact distally; and spasm with exquisite tenderness noted in the right trapezius region. Dr. Raab diagnosed significant right-sided trapezius spasm and prescribed physical therapy. (R. 378.) Also in February, Plaintiff saw Dr. Mangone for increasing anxiety; she did not complain of any pain. (R. 393.)

In March 2016, Plaintiff saw Dr. Mangone for severe right trapezius pain and spasm. She stated that she was waiting for her insurance to approve physical therapy and that she was "not interested" in pursuing pain management. Dr. Mangone prescribed Hydrocodone/APAP. (R. 398.) In April 2016, Plaintiff saw Dr. Mangone for allergies; she did not complain of any pain. (R. 397.) In May 2016, Plaintiff again saw Dr. Mangone for allergies. His treatment notes indicate bilateral trapezius tenderness, and he prescribed Xyzal and Hydrocodone/APAP. (R. 396.)

### 3.    After Date Last Insured.

On June 10, 2016, Dr. Raab reported that Plaintiff "has been developing progressively severe right-sided trapezius and interscapular spasm which is disabling" and also "some renewal of right-sided C6 numbness."  Physical examination findings were the same as in February, and he prescribed Percocet and Valium.  (R. 374.)  On June 20, a cervical spine CAT scan revealed anterior fusion of C5 and C6, and spondylosis with bony foraminal narrowing and hypertrophy on the left at C2-3 and C4-5 and on the right at C3-4.  (R. 377.)  On June 29, Dr. Raab's review of the CAT scan showed good graft and hardware position with incipient interbody fusion mass, and no evidence of neural compression.  He diagnosed progressively severe right-sided paraspinal and trapezius spasm associated with right-sided C6 paresthesia.  Dr. Raab again prescribed Percocet and Valium as necessary for pain relief and referred Plaintiff for trigger point injections.  He opined that her distal radicular symptoms might be caused by scalene spasm.  (R. 375.)

In July 2016, Plaintiff complained to Dr. Raab about stabbing pain and painful spasm in the bilateral upper trapezius with radiating pain to her right upper caseous/shoulder region and right lateral deltoid area.  She took Hydromorphone and Valium as needed for pain relief.  (R. 376.)[8]  Also in July 2016, Plaintiff saw Dr. Mangone for an adverse reaction to medication prescribed in advance of dental work; she did not complain of any pain.  (R. 392.)

In August 2016, Plaintiff saw Dr. Mangone for neck spasms when she exercised.  She stated that she did not want pain management injections because they caused migraines.  (R. 391.)

On September 2, 2016, Plaintiff saw Dr. Raab for shoulder and neck pain.  Physical examination findings included:  limited motor strength proximately but intact distally; and spasm

---

[8] The Court observes that Dr. Raab's July 7, September 2, and September 23, 2016 treatment notes appear to be missing pages.

in right trapezius region with exquisite tenderness.  Dr. Raab diagnosed cervical radiculitis.  (R.

379.)  On September 18, a cervical spine MRI revealed:  "1.  Status post anterior cervical

discectomy and fusion at C5-8.  Previously identified right paracentral disc herniation with

flattening of the cord is no longer present.  There is no cord compression at this level.  2.  Stable

spondylltic changes from C2-3 through C6-7."  (R. 384-85.)  During a September 23 follow-up

with Dr. Raab, physical examination findings included: exquisite tenderness on palpation and

percussion over the right scapular spine, with possible Tinel's over the scapular notch; tenderness

on palpation along the posterior and anterior right shoulder; and pain on active and passive

manipulation of the shoulder joint.  Dr. Raab diagnosed myofascial pain on right side.  (R. 380.)

Also in September, Plaintiff saw Dr. Mangone for neck pain and numbness in her fingers.  (R.

390.)

In October 2016, Dr. Mangone refilled Plaintiff's prescription for Hydrocodone/APAP.

(R. 389.)  In November 2016, Plaintiff saw Dr. Mangone for allergies; she did not complain of any

pain.  (R. 388.)  In December 2016, Plaintiff saw Dr. Mangone for neck pain but stated that she

did not want to see an orthopedist anymore and also did not pain management injections.  He

refilled her prescription for Hydrocodone/APAP.  (R. 387.)

In March 2017, Plaintiff was evaluated by Dr. Albert Yeo (family practitioner with Gotham

City Orthopedics) for right shoulder, neck, right upper arm, and upper back pain.  Plaintiff

complained that the right shoulder pain radiated to her fingers.  She stated that she began to have

pain in her right shoulder about 3-4 months after her January 2016 surgery.  She also stated that

Dr. Raab had "told her after a physical examination that it could possibly be her rotator cuff."

Physical examination findings included normal reflexes, sensations, and muscle strength; and

limited range of motion in right shoulder but unlimited on left.  Dr. Yeo ordered right shoulder

MRI and x-rays; prescribed Vimova, Lorzone, and Percocet; and referred her to pain management. He opined that Plaintiff's pain was likely coming from her neck. (R. 406-09.)

### B.    Non-Medical Evidence.

In November 2014, Plaintiff submitted a Function Report advising that she lived in a house with family and cared for her son, who was diagnosed with bipolar depression. She could feed and brush the dogs, but her sons walked and bathed them. It was hard for her to get comfortable enough to sleep because she felt pins and needles in her legs. She had no problems with personal care activities. She did not need reminders to take medicine. She cooked at least 4 times a week but could not lift heavy dishes out of the oven. She could do laundry but needed her sons to carry the laundry basket up and down the stairs. She could dust but could not mop floors; she tried to clean up as much as possible but needed breaks. She could not do yard work because her back and legs hurt. She sat outside every day. She drove a car but did not drive for long distances because her legs went numb. She could go out alone. She shopped for small items 2-3 times a week; her husband did the big food shopping. She could handle finances. She enjoyed scrapbooking but could not sit for long periods of time because her legs fall asleep. She spoke on the phone or visited with friends every day; she did not go anywhere on a regular basis. She sometimes became very irritable and cranky because of her pain, and these feelings affected her relationships. She and her husband fought a lot because of her back issues. She had problems lifting, walking, stair climbing, squatting, sitting, bending, standing, reaching, kneeling, and getting along with others. She could walk one block before experiencing leg pain that caused her to stop. She had no problems paying attention; could follow written and spoken instructions; and got along with others. She had to change her routine a lot over the past two years as her pain

worsened.  She was prescribed a walker and a brace after her October 2014 surgery; she continued to use the brace but no longer used the walker.  (R. 214-21.)

In June 2015, Plaintiff submitted another Function Report that was consistent with her previous report except as follows.  She needed to lie down frequently during the day and woke up in pain frequently during the night.  She had difficulty getting dressed and could no longer take baths because she could not bend.  She spent less than one hour daily cooking light meals for herself, and she spent less than one hour daily doing light chores.  She could not tolerate driving or sitting in a car (or anyplace else) for more than 20-30 minutes.  Her husband did all the shopping.  She could walk two blocks before needing to rest 10-15 minutes.  She could pay attention for one hour.  She was prescribed a cane after her October 2014 surgery and used it "sometimes walking any distance."  (R. 231-38.)

At the April 2017 hearing, Plaintiff testified in response to questioning from the ALJ.  The ALJ summarized Plaintiff's testimony as follows:

> During the hearing, the claimant testified that she is fully literate, despite having an eighth grade education.  She has a driver's license, and continues to drive regularly.  The claimant testified that she stopped working at her previous job due to her back condition.  She has back pain, which radiates to her right arm and shoulder and down her right leg.  The claimant has trouble with some household chores such as vacuuming and grocery shopping due to her back pain symptoms.  She stated that she still prepares meals regularly and does the laundry, but she tries to avoid reaching overhead.  The claimant lives with her husband, two adult sons, and mother-in-law, and she receives help from them in performing household chores.  She testified that she could sit for 30 minutes and occasionally uses a cane to ambulate due to her symptoms.

(R. 26.)  The Court notes the following additional testimony:

- Plaintiff lives in the first floor of a two-family home with her husband and their 22-year old twin sons.  Her 92-year old mother-in-law lives in the upstairs apartment.  Her oldest son does not live with them.  Plaintiff's husband and one of the twins works full-time; the other twin is enrolled in the police academy.

23

- Plaintiff cannot walk because of pain in her neck and lower back. She also has pain shooting down her right shoulder and right leg. Her right arm pain began within a few months of her January 2016 surgery. Dr. Raab gave her injections that did not relieve any discomfort and caused migraines.

- Plaintiff last worked in August 2014 as a server/waitress. She has worked as a server/waitress for the last 15 years doing 12-hour shifts for up 30 hours per week. She stopped because she knew she needed surgery and could not take the pain anymore. During her last year of work, she was absent at least twice a week. She previously applied for workers compensation from her February 2013 slip and fall; the application was denied.

- In 2014, Plaintiff "was able to do things a little bit better, but [] still always had to deal with the lower back." She is further limited now by her right arm.

- Plaintiff currently drives about three times a week to local places, like the store or to pick up her grandson from school. She grips the steering wheel with her right arm out of habit and must switch hands when she can no longer take the pain.

- Plaintiff spends an hour or so reading every day on an electronic device because she can walk around. The family watches her 8-year old grandson every other weekend. She watches movies with him at home because she cannot stand and walk around at the movie theatre. She stopped going to restaurants in 2014 because it hurt to sit for long periods of time.

- Plaintiff believes she was issued a cane when she started physical therapy after her October 2014 surgery. She used the cane at that time for walking down the street. She still uses the cane sometimes but did not bring it with her to the hearing. She can no longer use her right arm to hold the cane.

- Plaintiff no longer takes Flexeril or Neurontin but she still takes Vicodin.

(R. 44-78.)

## V.    DISCUSSION

### A.    Step Three.

The Step Three section of the ALJ's decision reads in its entirety:

The undersigned considered all of the claimant's impairments, individually and in combination, but could find no evidence that the combined clinical findings from such impairments reach the level of severity contemplated in the listings. Specifically, the undersigned analyzed the claimant's degenerative disc disease under Listing 1.04 for disorders of the spine. However, the record does not show

the requisite level of difficulty with ambulation.  Since the claimant shows no evidence of an impairment which meets or equals the criteria of a listed impairment or of a combination of impairments equivalent in severity (not in mere numbers) to a listed impairment, disability cannot be established on the medical facts.

(R. 25.)  Plaintiff contends that the ALJ committed reversible error by failing to explain why Plaintiff did not meet Listing 1.04; by failing to consider whether Plaintiff's impairment is medically equivalent to Listing 1.04; and by failing to consult a medical expert pursuant to Social Security Ruling 17-2p.

The Third Circuit instructs that the ALJ need not "use particular language or adhere to a particular format in conducting analysis" so long as "the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [claimant] did not meet the requirements for any [L]isting."  *Jones*, 364 F.3d at 505 ("the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review").  Thus, the Court must determine whether the evidentiary discussion – regardless of its placement in the ALJ's decision – supports a finding of not disabled at Step Three pursuant to the applicable legal standards.  The Court finds that the ALJ's evidentiary discussion in the Step Four section of the decision allows for meaningful judicial review.  The Court further finds, for the reasons explained below, that substantial evidence supports the ALJ's Step Three findings.

Plaintiff first argues that the ALJ erred because "the 1.04 listing does not expressly require an inability to ambulate as part of the criteria for meeting the 1.04 listing."  ECF No. 12 at 12. This argument is wrong.  Listing 1.04 requires a disorder of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda quina or the spinal cord), and:

A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

OR

B.    Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

OR

C.    Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Listing 1.04, available at https://www.ssa.gov/disability/professionals/bluebook/1.00-Musculoskeletal-Adult.htm. Listing 1.04C explicitly requires "an inability to ambulate effectively," which is defined under Listing 1.00B2b "as having insufficient lower extremity functioning (*see* 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of *both* upper extremities." *Id*. (emphasis added).[9] Plaintiff was prescribed a handheld cane in October 2014 that she sometimes continued to use as of April 2017. Plaintiff cites no evidence that using the cane limited functioning of both arms. Thus, the ALJ correctly found that, even if there were record evidence of lumbar spinal stenosis resulting in pseudoclaudication, Listing 1.04C was not met.

_____

[9] Listing 1.00J requires an examination of the claimant's ability to ambulate without the assistive device(s) in place.

Plaintiff next argues that the ALJ erred by failing to consider Listing 1.04B. This appears to be a typographical error. Plaintiff's brief does not cite evidence relevant to Listing 1.04B (i.e., spinal arachnoiditis) but does cite evidence relevant to Listing 1.04A:

> [T]he medical records demonstrate without any contradiction that the Plaintiff has had multiple herniated discs and degenerative spinal conditions confirmed by MRI studies in both her cervical and lumbar spine which necessitated several surgical procedures resulting in six levels of her spine being surgically fused. Aside from the obvious limitation of motion which could be due to having six separate vertebrae fused, the medical evidence in this case contains numerous findings which meets or equals listing 1.04 Subsection B for disorders of the spine. For example, her neurosurgeon, Dr. Raab, amply notes the presence of muscle weakness and atrophy, pain, limitations of motion, sensory low, as well as positive straight leg raising tests all in compliance with Subsection B of the 1.04 listing.

ECF No. 12 at 12 (citing R. 344, 347, 358, 264). Accordingly, the Court will consider Listing 1.04A. To meet Listing 1.04A, Plaintiff must demonstrate nerve root compression that lasted or was expected to last at least 12 months with the "simultaneous presence" of: neuro-anatomic distribution of pain; *and* limitation of motion of the spine; *and* motor loss (i.e., atrophy with associated muscle weakness or muscle weakness); *and* sensory or reflex loss; *and* positive straight-leg raising test (sitting and supine). *See* Social Security Acquiescence Ruling 15-1(4), *Radford v. Colvin: Standard for Meeting the Listing for Disorders of the Spine with Evidence of Nerve Root Compression*, 2015 WL 5564523 (F.R. Sep. 23, 2015) (explaining application of Listing 1.04A outside Fourth Circuit). First, Plaintiff's lumbar nerve root compression lasted for more than 12 months because it was revealed in her February 2013 lumbar spine MRI and was not eliminated until her October 2014 surgery. But Plaintiff does not cite – and the Court has not identified – any evidence that she simultaneously experienced the remaining Listing 1.04A criteria during the period between February 2013 and October 2014. Plaintiff's muscle strength during this period was consistently evaluated at 3-5 on a 5-point scale, and there is no evidence of positive straight leg raise test in both sitting and supine positions. There is no evidence that Plaintiff experienced

nerve root compression of her lumbar spine after October 2014; indeed, treatment notes consistently reflected that her back impairment was fully healed. The record citations on which Plaintiff relies are treatment notes from 2015 and relate to her subsequent sacroiliac issue. *See* ECF No. 12 at 12 (citing R. 344, R. 347, R. 358, R. 364). Second, Plaintiff's cervical nerve root compression did not last for more than 12 months because it was identified in her September 2015 cervical spine MRI and eliminated during her January 2016 surgery. Plaintiff's June 2016 cervical spine CAT scan did not reveal any evidence of neural compression. The Court therefore finds that substantial evidence does not support a finding that Plaintiff's lumbar or cervical spine impairments met Listing 1.04A.

Plaintiff next argues that the ALJ erred by failing to consider whether the combined severity of her lumbar and cervical impairments was medically equivalent to Listing 1.04. *See* ECF No. 12 at 12 ("[E]ven if the 1.04 listing is not precisely met, we respectfully submit that the ALJ should have considered whether the Plaintiff's impairment equaled that listing in light of the fact that the Plaintiff has severe disc pathology and reconstructive surgery not only in the lumbar spine, but in the cervical spine as well."). To equal a Listing, a claimant "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990) (emphasis in original). Plaintiff offers no medical evidence that her combined spinal impairments are equal in severity to all the Listing 1.04B or C criteria; indeed, the record is devoid of any evidence of spinal arachnoiditis or lumbar spinal stenosis. As to Listing 1.04A, Plaintiff has not offered medical evidence of nerve root compression in the lumbar and/or cervical spines that lasted or was expected to last at least 12 months accompanied by the simultaneous presence of the remaining criteria. *See Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 93 (3d Cir. 2007) (ALJ's failure to analyze medical equivalence at Step Three was

harmless error where claimant did not "point to any medical evidence ignored by the ALJ that would indicate that [claimant's] impairments are equivalent to one of the Listings the ALJ identified"); *Cosby v. Comm'r of Soc. Sec.*, 231 F. App'x 140, 146 (3d Cir. 2007) (affirming Step Three determination where Plaintiff "does not point to any medical evidence ignored by the ALJ that would show that [claimant's] impairments medically equaled one of the listings"). The Court finds that any error in the Step Three finding as to medical equivalence and Plaintiff's combined lumbar and cervical spine impairments was harmless.

Finally, contrary to Plaintiff's assertion, the ALJ is not required to "utilize the services of a medical expert to review whether impairments meet or equal applicable listings." ECF No. 12 at 12 (citing Social Security Ruling 17-2p, *Titles II & XVI:  Evidence Needed By Adjudicators At The Hearings And Appeals Council Levels Of The Administrative Review Process To Make Findings About Medical Equivalence*, 2017 WL 3928306 (S.S.A. Mar. 27, 2017)).  As Social Security Ruling 17-2p explains:

> If an adjudicator at the hearings or AC level believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, we do not require the adjudicator to obtain [medical expert] evidence or medical support staff input prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment.

SSR 17-2p, 2017 WL 3928306, at *4.  No medical expert was required in this case because the ALJ found based on substantial evidence that Plaintiff's impairments did not meet or medically equal any Listing.

**B.    Step Four – Plaintiff's Subjective Symptoms.**

The ALJ is required to assess the claimant's subjective complaints using a two-step process.  *See* 20 C.F.R. § 404.1529; Social Security Ruling 16-3p, *Titles II & VI:  Evaluation Of*

*Symptoms In Disability Claims*, 2016 WL 1237954 (S.S.A. Mar. 24, 2016).[10]  First, the ALJ must

determine whether the record demonstrates that the claimant possesses a medically determinable

impairment that could reasonably produce the alleged symptoms.  Second, the ALJ must evaluate

the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent

to which they limit the claimant's functional limitations.  To do this, the ALJ must determine if

objective medical evidence alone supports the claimant's symptoms; if not, the ALJ must consider

other factors, including:  (1) the claimant's daily activities; (2) the location, duration, frequency

and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the type,

dosage, effectiveness, and side effects of any medication taken by claimant to alleviate the pain;

(5) treatment, other than medication, the claimant receives or has received for relief of pain or

other symptoms, (6) any other measures other than treatment the claimant uses or has used to

relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional

limitations and restrictions due to pain or other symptoms.  The determination or decision must

contain specific reasons for weight given to the claimant's symptoms, be consistent with and

supported by the evidence, and be clearly articulated so the claimant and any subsequent reviewer

can assess how the adjudicator evaluated the claimant's symptoms.

    At Step Four, the ALJ found that Plaintiff's "medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however, the claimant's statements

concerning the intensity, persistence and limiting effects of these symptoms are not entirely

---

[10] Plaintiff cites both Social Security Ruling 16-3 and Social Security Ruling 96-7p, *Titles II & XVI: Evaluation of Symptoms In Disability Claims: Assessing The Credibility Of An Individual's Statements*, 1996 WL 374186 (S.S.A. Jul. 2, 1996).  *See* ECF No. 12 at 15-16.  Social Security Ruling 96-7p was superseded by SSR 16-3, which applies to ALJ decisions issued after March 16, 2016.  Social Security Ruling 16-3p "remove[d] the word 'credibility' from the analysis to make clear that there is no examination of a witness's character, and to hew closer to the regulatory language contained within the relevant C.F.R. provisions."  *Pidgeon v. Colvin*, No. 15-cv-2897 (JBS), 2016 WL 2647666, at n.7 (D.N.J. May 9, 2016) (finding that "analysis is the same under either ruling").

consistent with the medical evidence and other evidence in the record for the reasons explained in

this decision." (R. 26.) Plaintiff contends that the ALJ committed reversible error because:

> Although the ALJ cited the applicable regulations and rulings, and the ALJ
> concluded that the claimant's underlying physical impairment could reasonably be
> expected to produce her pain and other symptoms, the ALJ did not go on to follow
> the remaining factors which should have been considered in evaluating the
> claimant's subjective complaints. Although the ALJ did summarize some of the
> claimant's daily activities noted in her testimony she did not cite the location,
> duration, frequency and intensity of the claimant's pain or other symptoms, what
> precipitating or aggravating factors brought about the pain, including prolonged
> sitting or standing. Moreover, the ALJ did not cite the type, dosage, effectiveness
> and side effects of the pain medication, including narcotics such as Dilaudid,
> Oxycodone as well as Xanax that the claimant needed to take to alleviate her pain
> and other symptoms. Finally, the ALJ did not properly consider or analyze the fact
> that the claimant underwent two extensive and complicated surgeries including one
> four-level fusion in her lower back as well as a two-level fusion in her neck which
> she underwent to seek relief of her pain and other symptoms.

ECF No. 12 at 18-19. Plaintiff's characterization of the ALJ's decision is inaccurate. The ALJ

discussed: Plaintiff's 2001 lumbar spine surgery; Plaintiff's back pain and treatment for the 18-

month period that preceded her August 2014 alleged onset date up; Plaintiff's October 2014

lumbar spine surgery and recovery; Plaintiff's 2015 leg and sacroiliac pain and treatment;

Plaintiff's 2015 neck and arm pain and treatment; Plaintiff's January 2016 cervical spine surgery

and recovery; Plaintiff's shoulder pain and treatment from June 2016 (two months after her date

last insured) through March 2017; and Plaintiff's April 2017 testimony about her pains and

resulting functional limitations. (R. 26-28.) The ALJ also noted – and Plaintiff ignores – that:

Plaintiff's back pain was significantly better by November 2014 and was completely resolved by

January 2015; Plaintiff's leg pain was under control by January 2015; Plaintiff's arm pain was

completely resolved by February 2016, although she was prescribed physical therapy for some

surgical discomfort across her neck and shoulder regions; and in December 2016, Plaintiff refused

to see an orthopedist or receive any more epidural injections. (R. 26-28.)

Based on Plaintiff's Function Reports, testimony, and longitudinal medical history, the ALJ concluded that Plaintiff's pain and other subjective symptoms limited her to sedentary work with non-exertional limitations. *See Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 765 (3d Cir. 2009) ("ALJ affords due weight to a claimant's subjective complaints when he limits her to work at a significantly lower level than previously performed."); *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir.1986) (where ALJ accepted claimant's subjective complaints as "precluding any work above a sedentary level ... the ALJ gave [claimant's] complaints essentially conclusive effect."). The Court rejects Plaintiff's argument that the ALJ insufficiently considered the type, dosage, effectiveness, and side effects of prescribed pain medications in assessing Plaintiff's symptoms. Plaintiff cites to Dr. Raab's January 2015 treatment note as support for the allegation that, at unspecified times, "she was prescribed numerous pain medications including Dilaudid, Hydrocodone, as well as Xanax without significant relief." ECF No. 12 at 5 (citing R. 347). However, Dr. Raab's only references to prescription medication were that Plaintiff's lower extremity paresthesia (developed after her October 2013 lumbar spine surgery) was responding well to Neurontin, and that Plaintiff would be evaluated for epidural injections to treat her sacroiliac pains (also developed post-October 2013). The Court observes that Dr. Raab advised in February 2016 that Plaintiff "takes occasional Vicodin" and that "Valium helps" with the spasmodic post-cervical spine surgery neck and shoulder pain. Plaintiff offers no evidence of alleged or opined side effects that could result in functional limitations during the relevant period beyond the 10% off-task limitation included in the decisional RFC. The Court therefore finds that substantial evidence supports the ALJ's assessment of Plaintiff's subjective symptoms.

C.    **Step Four – RFC Finding.**

Also at Step Four, the ALJ found:

> [T]he claimant had the residual functional capacity to perform sedentary work as
> defined in 20 CFR 404.1567(a) except lift and/or carry up to 10 pounds
> occasionally and less than 10 pounds frequently; stand or walk for two hours in an
> eight-hour workday; sit for six hours in an eight-hour workday.  The claimant can
> occasionally climb ramps and stairs, balance on wet or uneven surfaces, and kneel;
> occasionally stoop, and crouch; the individual cannot crawl; she cannot climb
> ladders, ropes, or scaffolds or work around hazards, including moving mechanical
> parts or at unprotected heights; can occasionally reach overhead with the right
> upper extremity.  The individual will be off-task 10% of the workday due to the
> impairments.

(R. 25.)  Plaintiff contends that the RFC finding is the result of three reversible errors:  (1) "the

ALJ extensively relied upon irrelevant evidence that predated the onset date of August, 2014;"

(2) the ALJ's finding that Plaintiff received sporadic and infrequent treatment for her back pain

between 2015 and 2017 "is actually contrary to the overwhelming weight of the medical evidence

of record;" and (3) the ALJ erroneously gave little weight to Dr. Raab's May 2013 opinion.  ECF

No. 12 at 13-14.  The Court disagrees.

First, the ALJ's evidentiary discussion spans nearly five pages but devotes less than one

page to Plaintiff's medical history prior to her alleged onset date of August 24, 2014.  The ALJ

described Plaintiff's treatment following a slip and fall incident in February 2013 that allegedly

exacerbated a pre-existing back impairment.  The ALJ gave "partial weight" to Dr. Nachwalter's

May 2013 opinion – issued for purposes of a worker's compensation claim – that Plaintiff could

return to work.  The ALJ found that Dr. Nachwalter's opinion was consistent with his physical

examination findings but "*precedes the claimant's alleged onset date by over a year.*"  (R. 29

(emphasis added).)  The only medical evidence between Dr. Nachwalter's opinion and Plaintiff's

October 2014 lumbar spine surgery consists of:  Dr. Raab's May 2013 opinion that Plaintiff should

be evaluated for steroid injection treatment and, if such conservative treatment did not provide

adequate relief, for surgery;  a June 2013 physical therapy evaluation during which Plaintiff stated

that she had just started a new job working full-time at a restaurant; a July 2014 referral from Dr.

Raab's advanced nurse practitioner for a lumbar spine MRI because Plaintiff was interested in

pursuing surgery to relieve increasing pain that was affecting her ability to work; and Dr. Raab's

August 2014 opinion (in which he quoted his May 2013 physical examination findings verbatim)

that Plaintiff required surgery.  (R. 26-27.)  As discussed above, all of this evidence was relevant

to the 12-month duration requirement for the Step Three analysis.  It was also relevant to the RFC

finding for the period between the alleged onset date and Plaintiff's October 2014 lumbar spine

surgery.[11]  The Court therefore finds that the ALJ did not error by including in the decision

references to medical evidence that pre-dated Plaintiff's alleged onset date.

Second, Plaintiff asserts that "there is absolutely no support for the ALJ's characterization

of the evidentiary record that the claimant only received 'sporadic infrequent treatment between

2015 and 2017' (Tr. 27)."  ECF No. 12 at 14.  The Court observes that the ALJ's description of

the medical evidence in 2015 (and 2016 and 2017) is more extensive than Plaintiff's brief.

*Compare* ECF No. 12 at 5-6, 13-14 *with* R. 27-28.  However, the Court need not resolve the parties'

dispute over the ALJ's characterization of Plaintiff's treatment during these periods as "sporadic"

or "infrequent."  The Court's role is to determine whether substantial evidence supports the ALJ's

RFC finding *through March 31, 2016*.  Dr. Raab advised in January 2015 that Plaintiff was

progressing extremely well with resolution of her preoperative back pain and that Plaintiff's lower

extremity paresthesia was responding well to Neurontin.  Dr. Haber advised on the same date that

Plaintiff was experiencing right sacroiliac pain after attempting to restrain a dog over the holidays.

---

[11] Indeed, the decisional RFC barred Plaintiff from returning as of August 24, 2014 to the same job to which
Dr. Nachwalter opined she was able to return in May 2013.

He recommended a sacroiliac injection and noted Plaintiff's statement that, prior to the injection, she would take a Xanax tablet prescribed for nerves by her primary care physician.  Plaintiff had an initial sacroiliac injection in February 2015.  There is no further medical evidence until June 2015, when Dr. Raab reported that Plaintiff's right sacroiliitis had returned and would require a second sacroiliac injection.  In September 2015, Dr. Raab reported that Plaintiff was unable to proceed for logistical reasons with the recommended second sacroiliac injection; that Plaintiff had since developed neck and right arm pain associated with heaviness and numbness; that Plaintiff was a candidate for cervical surgery; and that epidural steroid injections could be used as a temporizing measure.  In December 2015, Dr. Raab advised that one steroid injection had not provided significant relief and that Plaintiff was scheduled for surgery in January 2016.  In February 2016, Plaintiff advised Dr. Raab that her right arm pain was completely resolved.  She also complained about surgical discomfort across the posterior neck and trapezius regions on the right side for which she occasionally took Vicodin and Valium, and for which Dr. Raab prescribed physical therapy.  Also in February 2016, Plaintiff saw Dr. Mangone but did not complain of any pain.  In March 2016, Plaintiff complained to Dr. Mangone about severe right trapezius pain and spasms for which he prescribed Hydrocodone/APAP.  Plaintiff does not argue that any of this evidence supports additional limitations for the relevant period beyond those included in the decisional RFC.  *See Stockett v. Comm'r of Soc. Sec.*, No. 15-cv-7692 (RMB), 2016 WL 6275163, at *16 (D.N.J. Oct. 26, 2016) (harmless error where ALJ ignored treating physician's diagnosis of impairment but "there is no evidence that Plaintiff's [impairment], if credited by the ALJ, would have impacted the RFC determination, given that [treating physician] assigned no limitations to Plaintiff stemming from the diagnosis.").  The Court therefore finds that any error in the ALJ's

characterization of Plaintiff's medical treatment from 2015 to 2017 as sporadic and infrequent was harmless.

Third, Plaintiff argues that the ALJ erred by ascribing little weight to Dr. Raab's May 2013 opinion "on the basis that his opinion that the claimant was not able to engage in any significant range of sedentary work was somehow inconsistent with his physical examination findings." ECF No. 12 at 14 (citing R. 29 (citing Ex. 6F, pg. 8 [R. 303])). In fact, Dr. Raab did not opine as to Plaintiff's ability to engage in any significant range of sedentary work. Dr. Raab's treatment notes for May 2013 indicate, in a section entitled "Impression and Plan," that Plaintiff "is experiencing a great deal of predominately axial lumbar pain, along with right-sided L5/S1 radiculopathy, which now interferes with all activities. She is *unable to work or engage in leisure pursuits*." (R. 303 (emphasis added).) The Court notes that Dr. Raab's treatment note for August 2014 contains the same language. (R. 314 ). It is unclear in the first instance whether Dr. Raab is offering an opinion as to Plaintiff's abilities or whether he is repeating Plaintiff's subjective assessment of her abilities. To the extent this language constituted Dr. Raab's opinion, it is not entitled to controlling weight because it does not reflect judgments about the nature and severity of Plaintiff's impairments, including her symptoms, diagnoses and prognoses, what she can still do despite her impairments, and her physical or mental restrictions. 20 CFR § 404.1527(a); *see id.* at § 404.1527(d) (treating physician "opinion" that claimant is disabled and unable to work is never controlling because such findings are reserved for Commissioner). As the ALJ noted, Dr. Raab's treating notes through February 2016 do not reflect physical examination findings suggestive of more restrictive limitations than the decisional RFC. (R. 29 (citing Ex. 6F [R. 296-336]; Ex. 9F [347-373]).)

Finally, Plaintiff notes that the ALJ's decision concluded the paragraph regarding Dr. Raab's opinion as follows:

> By March of 2017, the claimant's physical examination showed no evidence of tenderness in her shoulder, though of range of motion was slightly reduced. She had 5/5 strength in all muscle groups tested, and sensation was intact and equal in all dermatomal areas tested. Her left upper extremity was grossly normal (Ex. 7F). This evidence is inconsistent with the opinion that the claimant is completely disabled.

(R. 29.) Plaintiff is correct that Exhibit 7F is not a treatment note from Dr. Raab for March 2017 – indeed, there are no treatment notes from Dr. Raab after June 2016 – but a letter to Dr. Kriso (Plaintiff's initial primary care physician) from Dr. Raab reporting on Plaintiff's January 2015 examination. The language attributed by the ALJ to Exhibit 7F comes from Exhibit 12F, which is a March 2017 treatment note from Dr. Yeo (Plaintiff's most recent primary care physician). The Court finds that this typographical error was harmless for two reasons. First, contrary to Plaintiff's assertion, the ALJ did not conclude that Dr. Raab's opinion was inconsistent with his physical examination findings. The ALJ found that Dr. Raab's opinion was "inconsistent with the claimant's *medical record*." (R. 29 (emphasis added).) Second, although March 2017 is a full year outside the relevant period, Dr. Yeo's treatment note does not support additional limitations prior to March 31, 2016 beyond those included in the decisional RFC

## VI.    CONCLUSION

For the reasons explained in this Opinion, the Court affirms the Commissioner's decision that Plaintiff was not disabled as set forth in the accompanying Order.


Dated:  May 3, 2019                      _____s/ Paul A. Zoss_____
At Newark, New Jersey                    PAUL A. ZOSS, U.S.M.J.